Good morning. The cases will be called in the order listed on the docket. The first case is Horn v. Astrue. Good morning, Your Honor. I'm Paul Eaglin from Fairbanks representing Mr. Horn. I joined the others yesterday, I'm sure, who welcomed you to Alaska. Welcome to Alaska and welcome to Anchorage. Thank you. Thank you for hearing my client's case. As you notice from the briefing, there are a couple of major points I would like to, in my presentation, address. The first one is the second point of my brief, which is that, as reflected in the debate, the intramural debate that I highlighted in my brief, there's a substantial basis here in this record for finding Mr. Horn disabled as of age 50. And I mentioned the location in the record during the briefing that I presented. But the major concern that I have, of course, is the interpretation of Social Security Ruling 83-20. You notice that my colleague, Ms. Nishalaney, provided a supplemental authority with respect to the Gary Sam case that was issued last fall. It was argued here in Anchorage last year. Counsel, before you proceed further, you mentioned the intramural debate. Sure. Wasn't that about the onset date? Part of it was about the onset date because the debate between the Anchorage Disability Determination Services and the Seattle Quality Review Branch was, if he's found capable of light exertional capacity or sedentary exertional capacity, the case turns on that. And Anchorage was saying, we should find this guy disabled as of age 50, November 11, 2000, when he turned 50, by finding that he's capable only of sedentary, which means that he grids out, as the expression goes. He had alleged an onset date about a year earlier than that. But Anchorage, the State Disability Determination Services was saying, we should find him disabled at sedentary. He grids out because of his age, as of age 50. So in that sense, yes, Judge Rawlinson, it was about onset date in the sense that the Disability Determination Services was saying, his onset should be placed at age 50, as of acquisition of age 50, November 11, 2000. Does that answer your question? If they actually used the term onset date, or was it about the nature of the residual function? It was more that, Your Honor. I would agree with that statement of it, is that the real debate was, should he be light or should he be sedentary? Because the whole case turned on that, and ultimately Seattle overruled, I guess you could say, the Disability Determination Services and said, he's at light. And that stuck, as we see, with the further development of the record. Through the administrative processing, at the administrative hearing before Judge Adams, he found and he accepted the residual functional capacity that had been found by the state agency physician, who, as I pointed out in the brief, reviewed this file before most of the medical development was even done. He'd reviewed it and, sorry? If the real debate was about the residual function capacity as opposed to the onset date, why would SSR 8320 come into play then? It can be decided without SSR 8320 because if one finds that the evidence supports sedentary, then as of age 50, then 8320, I would agree with you, with the point of your question, which is that it would be not so important if the RFC is found at sedentary as of when he became age 50 on November 11th in 2000. And I think the 8320 argument basically goes by, it is less important then. And I think that may be, well, it may be one of the reasons why you don't see it mentioned so much in the intramural debate, but I think another reason may be that at that level, at the administrative level, I don't think they're concerned so much about the SSRs as when we get into... On what date did he turn 50? November 11th, 2000. But I thought the disability date that he put in his application was August 31st, 1999. That's true. But what was happening is, even though he had alleged that as his onset date, the Disability Determination Services was saying, even though he said that, we think that the evidence here would support a finding of sedentary residual functional capacity as of his age 50. And basically they were modifying the onset date. Which gets back to your original question, Judge Wallinson, whether this whole intramural debate was about onset date. And in that sense, I would say, again, yes, it was to that extent about onset date. This is not unusual either for an adjudicator at some level, whether it's at DDS or an ALJ at a hearing, to determine that even though onset date may be date X, in fact, the evidence supports a finding of onset at X plus one year or two years later. When was the date last insured? Late end of 2003. So there's not really an issue of date last insured in this one. I don't want to interrupt whatever you plan to tell us, but at some point you want to talk about the credibility determination, don't you? Right. Well, I think that the credibility determination that was made here... You don't have to do it now. I'm happy to go to that. As you notice from the briefing there, if you were to accept the argument that I made in the briefs on behalf of Mr. Horn, then he should be credited as true here if you find, for example, along the lines of the analysis presented by the Disability Determination Services here out of Alaska. That's basically the point number two in the brief, which has to do with the incorrect finding of a residual functional capacity. We say that the evidence properly supports a finding of sedentary. And I pointed out, for example, in the brief, that one of the major elements that was used at the administrative hearing for finding him not fully credible was a finding that, or the assertion on behalf of the administrative law judge, that a treating physician, Dr. George Raeblich, had supposedly questioned his complaints about his entire spine hurting. And I discussed in the brief why I think that's not supportable by the record. And then the other points that were used by the administrative law judge I think were insubstantial in terms of not being specifically legitimate or clear and convincing. I think that you should not find that the record supports the credibility finding that was made here. And I wonder if I might be able to retain the remainder of my time. Let me just ask you one question. What is the strongest medical evidence from your perspective that supports a finding of sedentary restriction? I would agree with the type of analysis that you see there in the, that the Anchorage Disability Determination Service has pointed out in that debate that I pointed out. And that is they were finding that based on the extent of his degenerative disc disease. And he was limited only to certain. Which medical, which treatment, treating or examining physicians? It would be Dr. George Raeblich was his treating orthopedic, he's a doctor in Fairbanks. And there's a lot of evidence from him. But it would be generally the records that you see from Dr. George Raeblich. And I think that's what was relied on by the DDS in saying that we think that his RFC should be sedentary. All right, thank you. Sure, thank you. And I'd like to reserve the rest. Surely. Thank you. Please proceed, counsel. Good morning. Nancy Mitchell, for the commissioner. I'm a little bit at a disadvantage here. You better keep your voice up a little bit. Okay. Maybe you can lower the microphone there. Now if I lower the microphone, I'm having problems getting my. Okay. Okay. Too much material. There's too much material. Exactly. Your Honor, I'd like to answer your question about the medical evidence. Mr. Horn saw Dr. Raeblich only one time. And that is at 438. And the record, he saw him in June of 2002. And then he called a month later and canceled his appointment. And then he never went back again to Dr. Raeblich. So the opposing counsel says that Dr. Raeblich was the strongest medical evidence to support finding a sedentary capacity. Do you think that dooms his case? Well, definitely I think that dooms his case in terms of what Dr. Raeblich says, because he basically gave him an injection, sent him off to x-ray. When he came back from x-ray, he was now complaining of his whole spine hurting. And Dr. Raeblich said, I find this a little unusual. And the ALJ found that that discredited Mr. Horn's allegations of pain. This Court should affirm the ALJ's decision because it's supported by substantial evidence for two main reasons. Mr. Horn's allegations just really don't make sense. And the objective evidence doesn't support the level of pain that he's complaining about. Initially, Mr. Horn, he was laid off in August of 1999. And then he began receiving early retirement benefits from his union in the summer of 2000. He admitted that he never tried to get any other job after August of 1999. He testified that he was in a retired state now. So he couldn't do the heavy construction, and the ALJ said that. He could not do the heavy construction work that he had been doing. But he can do other work. And he never tried to get a light job. Now, in his testimony, he says his fingers are numb. But on the other hand, he plays his guitar up to four hours a day. And he also says he can play many musical instruments. He says he spends most of his time lying in a recliner at home, but he played his guitar professionally several times in 2001. And he came to the hearing with a neck brace, a back brace, and a cane that he said his doctor prescribed. However, that's nowhere in the medical evidence. He says he hits the floor plenty of times, but he never complained to any medical professional that he hit the floor or that he collapsed from pain. He alleges this constant stabbing pain, but during most of the relevant period, he didn't take any medication at all, not even over-the-counter medication. Now, at one point, and I'll admit in the record, he said he couldn't afford it. But he smoked cigarettes, he drank beer. If you can pay for cigarettes and beer, you can pay for a bottle of ibuprofen. So the reasonable inference of this is that if he didn't even take over-the-counter medication, the pain really wasn't all that bad. You know we're not going to make a factual determination. What do you see the question before us, the legal question that we have to resolve? The question is whether the ALJ's decision is supported by substantial evidence. Did the ALJ rationally interpret the medical evidence? And I would submit to you that the ALJ made a rational interpretation of the evidence. Mr. Horn would like you to interpret the evidence the way he sees the evidence. However, if the evidence is susceptible to rational interpretations, it's the ALJ's interpretation that this Court must uphold. And in terms of the actual medical evidence, the MRI findings from September of 2003, the thoracic spine, now it says there's annular bulging apparent at T7, 8, T8, 9, and T11 through 12 without significant compromise of the sagittal dimension of the spinal canal. In other words, it's not impinging or pressing on the spinal canal. And further, the MRI findings said no specific localizing abnormality that might relate to chronic back pain is identified. And then in terms of the left shoulder, there was a left shoulder MRI as well, and the left shoulder showed no abnormality. And this is from September of 2003. In this case, very conservative treatment has been recommended. Physical therapy, anti-inflammatories, chiropractic adjustments, home exercise program, but no one has suggested surgery. So it's not serious enough. I mean, sure, he has back pain, but it's not that severe. No one has suggested that he have surgery. The orthopedic consultant, Dr. Smith, found no objective evidence of neurological deficits on November 1st, or November of 2001. His muscle strength was five out of five in the upper extremities, and he had good grip strength. So that goes also to the numb fingers, is that his grip strength is good. So what's your response to opposing counsel's argument that the ALJ misrepresented the statement that was made by Dr. Freidlich regarding the pain being unusual? Well, Your Honor, I would say that the ALJ reasonably interpreted that evidence. Mr. Horne would have you think that his interpretation, that it doesn't mean anything, that he just thought it was a little strange. Well, what did the doctor say, and what did the ALJ say that the doctor said? The ALJ... The doctor said what? The doctor said that he found it... When he returns from x-ray, the patient is now complaining of his whole spine hurting. I find this a little unusual. And what did the ALJ say that the doctor said? Well, the ALJ found that, or discredited Mr.... He said that the back pain was unusual, and that's not what Dr. Freidlich said. Dr. Freidlich said that it was a little unusual that his whole spine would be hurting after an x-ray, not that the back pain was unusual. He was not discounting the fact that he had back pain. The ALJ acknowledged that Mr. Horne did have back pain, which is why he limited him to light work with the limitations in the RFC. He found him limited to light work. He could only lift or carry up to 20 pounds occasionally and 10 pounds frequently. Now, this is vastly different from what Mr. Horne used to do. He used to do very heavy construction work. And he can't do that anymore, and that's acknowledged. But he could lift or carry up to 20 pounds occasionally and 10 pounds frequently. So the ALJ accounted for the fact that he did have some pain. However, as this court said in Fair v. Bowen, many medical conditions produce pain not severe enough to preclude gainful employment. And an ALJ can't be required to believe every allegation of disabling pain or else disability benefits would be available for the asking, a result that's plainly contrary to the statute. So here the objective findings really do not support the level of severity that Mr. Horne complains of. Also, Dr. Ritham, that's another orthopedic consultative examiner, he examined Mr. Horne in October of 2003, and he found no evidence of radiculopathy or myelopathy. He observed normal gait, 5 out of 5 strength in his extremities. And, Your Honor, I'm not going to speak. I don't know that the court wants me to speak to Mr. Horne's main issue, which was the issue of the medical expert. I believe that the supplemental authority that I sent to the court, Sandra v. Astru, is dispositive of that issue that no medical expert is required where the ALJ finds that the person is not disabled in the relevant time period and never found him disabled at all. So unless the court has any further questions for me, I would ask that this court affirm the district court's decision and the ALJ's decision because it is based on substantial evidence. All right. Thank you, counsel. You made it through with your materials intact. And they didn't fall down. I heard every word you said, too. You did fine. Thank you. With respect to 8320 and the SAM decision, I would not agree that it is dispositive in the sense that if there is an ALJ finding that one is not disabled at any time, then the discussion is over with. There's a context to SAM. There's that ruling, if one were to just state what the ruling is. But the context, as the court said in SAM, is in the part at the end of the case where it was rejecting the cases that I was relying on, Armstrong, Guillermet, and Morgan. It said that those are to be distinguished from Mr. SAM's case because in those there was either an explicit ALJ finding that the person was disabled or there was substantial evidence. Here we have, unlike SAM, we have substantial evidence. I mean, the debate within the agency itself is sufficient indication, I would contend, that we have substantial evidence of disability here. In fact, the debate turned on whether he should be classified as either light, residual functional capacity, or sedentary. SAM was quite different. The context in SAM was he had a remote alleged onset date, a remote date last insured, and he had, as the court said in SAM, sparse medical evidence for the period prior to his date last insured. What he was trying to do was to present evidence from almost ten years later of a degenerative progressive type impairment and asking the court to call a medical expert to infer whether that impairment could have onset during the time when he was insured. We have a quite different situation here. So that's the context in SAM. And I would ask the court to keep that in mind. And for the reasons that we briefed and for what has been said here, if you would rule in favor of Mr. Horn for the reasons that I said, which is on the one hand you could find that he was disabled as of age 50 at sedentary RFC. Thank you. Thank you, counsel. Thank you to both counsel. The case just argued is submitted for decision by the court. The next case, United States v. Hayes, is submitted on the brief. The next case on calendar for argument is North Slope Borough v. Minerals Management Services.
judges: Farris, Thompson, Rawlinson